## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| ANGEL RIVERS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 1:08-cv-1824 |
| vs. | ) Judge Sidney I. Schenkier |
| | ) |
| MICHAEL J. ASTRUE, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER[1]

The plaintiff, Angel Rivers, has filed a motion seeking summary reversal and/or remand of a final decision by the Commissioner of the Social Security Administration ("SSA") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 405(g), 416(i), and 423(d) (doc. # 17). The Commissioner has filed a motion seeking summary affirmance of the decision denying benefits (doc. # 18). For the following reasons, Ms. Rivers' motion for reversal and/or remand is denied, and the Commissioner's motion for affirmance is granted.

**I.**

We begin with a summary of the procedural history in this case. On February 23, 2005, Ms. Rivers applied for DIB (R. 71-73), stating that she was disabled due to carpal tunnel syndrome ("CTS") and lateral epicondylitis in both arms (R. 55, 96) with an onset date of June 19, 2003 (R. 55, 71). Her application was denied initially (R. 60-64) and on reconsideration (R. 50-55).

---

[1]On November 4, 2008, pursuant to joint consent of the parties and 28 U.S.C. § 636(c), the Executive Committee reassigned this case to this Court for all proceedings, including the entry of final judgment (doc. ## 13, 14).

Ms. Rivers then requested and was granted a hearing before an administrative law judge ("ALJ"), which took place on May 29, 2007 (R. 358-441). Ms. Rivers and her husband, Keith, appeared with counsel and testified; a vocational expert ("VE") also testified (R. 424-41). At the hearing, Ms. Rivers' counsel asked to amend her alleged onset date from June 19, 2003 to February 23, 2005, on the ground that Ms. Rivers' condition had deteriorated after that date (R. 14; 363-64). On questioning from the ALJ, Ms. Rivers stated that she "understood the consequences of the amendment and agreed that she wished to" proceed on that basis (R. 14). It also appears that the basis for plaintiff's DIB claim was amended at some point to shift the SSA's review from CTS and lateral epicondylitis to fibromyalgia and tendinitis of the wrists (R. 50-51).

On June 25, 2007, the ALJ issued a written decision, finding Ms. Rivers insured for DIB through December 31, 2008 (R. 16), but denying DIB benefits to Ms. Rivers based on the Medical Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2. On August 15, 2007, Ms. Rivers filed a request for review of this decision (R. 10). In its review decision, dated January 26, 2008, the Appeals Council affirmed the ALJ's finding that the plaintiff was not disabled, making the ALJ's decision denying DIB final (R. 4-5). *See also* 20 C.F.R. § 422.210(a) (2004). On March 31, 2008, Ms. Rivers then initiated this civil action for judicial review of the Commissioner's final decision. 42 U.S.C. § 405(g).[2]

---

[2]In her February 23, 2005 application, Ms. Rivers also sought Social Security Income ("SSI"). The ALJ determined that plaintiff did not qualify for SSI due to her husband's earnings (R. 15). Although the denial of SSI was part of the final determination, plaintiff has not raised that issue in her appeal to this Court. Thus, Ms. Rivers has waived any challenge to that decision.

We also note that Ms. Rivers previously filed applications for Title II (DIB) and SSI benefits on May 19, 2004, but she did not timely request a hearing after the adverse initial and reconsidered determinations on those claims. The fact that Ms. Rivers filed the current application only a few months later, however, ordinarily would be considered an implied request to reopen the earlier applications. But, plaintiff's stipulation to amend her onset date to February 23, 2005 eliminates that implication, and thus her May 19, 2004 application is not before us for consideration.

**II.**

We begin our review of the Commissioner's determination with the governing legal standards. In order to establish a "disability" under the Act, a claimant must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A claimant must demonstrate that his impairments prevent him from performing not only past work, but also any other work that exists in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A).

The social security regulations prescribe a sequential five-step test for determining whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4). Under this rule, the ALJ must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is unable to perform past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520(a)(4); *see also Young v. Sec'y of Health and Human Serv.*, 957 F.2d 386, 389 (7th Cir. 1992).

A finding of disability requires an affirmative answer at either Step 3 or Step 5. *See* 20 C.F.R. § 404.1520(a)(4). A negative answer at any step other than Step 3 precludes a finding of disability. *Young*, 957 F.2d at 389. The claimant bears the burden of proof at Steps 1 through 4, after which the burden shifts to the Commissioner at Step 5. *Id.* In cases of severe impairment, the ALJ's analysis typically involves an evaluation of the claimant's residual functional capacity

3

("RFC") to perform past relevant work. *See* 20 C.F.R. § 404.1520(e). If a person can still do this type of work, then at Step 4 the Commissioner will find that the person is not disabled. *Id.*

The Step 5 analysis involves an evaluation of the claimant's RFC to perform any work other than past relevant work in the national economy. *See Bowen v. Yuckert*, 482 U.S. 137, 142 (1987); 20 C.F.R. § 1520(g)(1). At Step 5 the government carries the burden of "providing evidence that demonstrates that other work exists in significant numbers in the national economy that [the claimant] can do given [his] residual functional capacity and vocational factors." 20 C.F.R. § 404.1560(c)(2). Although the burden at this step shifts to the government to produce evidence regarding work opportunities, the government is not responsible for producing any evidence regarding the claimant's residual functional capacity. 20 C.F.R. § 404.1560(c)(2). This is because the same residual functional capacity used at Step 4, for which the claimant carries the burden of proof, is applied at Step 5. 20 C.F.R. § 404.1560(c)(2). If a claimant's RFC allows him or her to perform jobs that exist in significant numbers in the national economy, the Commissioner will find the person not disabled. 20 C.F.R. § 404.1520(g)(1).

In reviewing the ALJ's decision, this Court may not decide facts anew, reweigh evidence or substitute its own judgment for that of the ALJ. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The Court must accept the findings of fact that are supported by "substantial evidence." 42 U.S.C. § 405(g) (2002). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Dray v. R.R. Retirement Bd.*, 10 F.3d 1306, 1310 (7th Cir. 1993) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). When conflicting evidence allows reasonable minds to differ, the responsibility for determining whether the claimant is disabled falls upon the Commissioner (and by extension the ALJ), not the courts. *See Herr v.*

4

*Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990); *see also Stuckey v. Sullivan*, 881 F.2d 506 (7th Cir. 1989) (the ALJ has the authority to assess medical evidence and give greater weight to that which the ALJ finds more credible). The Court is limited to determining whether the Commissioner's final decision is supported by substantial evidence and based upon proper legal criteria. *Delgado v. Bowen*, 782 F.2d 79, 81 (7th Cir. 1986) (per curiam).

However, the ALJ is not entitled to unlimited judicial deference. The ALJ must consider all relevant evidence, and may not elect to discuss only the evidence that favors his or her ultimate conclusion. *See Herron*, 19 F.3d at 333. Although the ALJ need not evaluate in writing every piece of evidence in the record, the ALJ's analysis must be articulated at some minimal level and must state the reasons for accepting or rejecting "entire lines of evidence." *Id.*; *see also Young*, 957 F.2d at 393 (the ALJ must articulate a reason for rejecting evidence "within reasonable limits" if there is to be a meaningful appellate review). The written decision must provide a "logical bridge from the evidence to the conclusion" that allows the reviewing court a "glimpse into the reasoning behind [the] decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 887, 889 (7th Cir. 2001) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). Specific reasons are required so that the reviewing court can ultimately assess whether the ALJ's determination was supported by substantial evidence, or instead was "patently wrong" *Id.* (quoting *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000)).

### III.

The following facts are taken from the record and are material to the disability decision we are reviewing. We begin with general background (Part A) and then move to Ms. Rivers' subjective

5

complaints of pain (Part B), the medical records (Part C) and the ALJ's written opinion denying benefits (Part D).

## A.

Ms. Rivers was born on June 21, 1974 (R. 104). She dropped out of school sometime between her 8th and 11th grade years; the ambiguity concerning the extent of her education results from discrepancies in Ms. Rivers' statements. For example, on July 14, 2005, she told a doctor that she had a 10th grade education (R. 249); but, in a Social Security Agency form dated March 9, 2005, she stated that she completed 11th grade (R. 102). Later, at the administrative hearing, Ms. Rivers told to the ALJ that both of those statements were lies, and that in fact she had only completed the 8th grade (R. 372). Ms. Rivers explained that at the hearing she was telling the truth about the extent of her education because she had become a Jehovah's Witness (R. 372).[3] Then, when questioned by the ALJ regarding high school enrollment records, Ms. Rivers recalled that she had education beyond the 8th grade, taking about four months of classes in the 9th grade (R. 373).

Ms. Rivers also was inconsistent about her reason for dropping out of school. At the hearing, Ms. Rivers said she dropped out, because she felt "she was not getting a sense of what was being taught" and her "concentration level was not there" (R. 372-73). That stated reason was contrary to an earlier statement made to a psychiatrist, in which Ms. Rivers said she dropped out because she was involved with "the wrong people" (R. 249). Ms. Rivers testified that in approximately 1995 or

---

[3] We note that the March and July 2005 statements about the extent of her education, which Ms. Rivers conceded at the hearing were false, occurred after she became involved with the Jehovah's Witness Church in January 2005 (R. 415), but before she said she officially became a member on March 10, 2007 (R. 422) – a little less than three months before the administrative hearing.

6

1996, she attempted to get a GED, but did not complete the course or take the GED test because she felt the work was too hard and she could not concentrate on doing it (R. 374).

Ms. Rivers has been married to Keith Rivers since 1997; they have one son, Jayleyn, born on November 13, 2002, who is now school age. During the pendency of her DIB application, Jayleyn was not in school yet, and plaintiff acted as the full-time primary care-giver during the day (R. 249, 409-11, 423). Ms. Rivers testified that she and/or her son often would visit his grandmothers in their apartments, which are located above plaintiff's apartment and are in the same building (R. 409-10). Ms. Rivers testified that she and her husband share responsibilities for their child in the evening after he returns from work (R. 411), but Mr. Rivers testified that when he comes home from work, he takes over all responsibilities for their son (R. 438).

According to the employment records, Ms. Rivers previously worked as a cashier (light, semi-skilled); loader (medium, unskilled); sorter (light, semi-skilled); coffee server (light, semi-skilled); bank teller (light, semi-skilled) and customer service representative (sedentary, semi-skilled) (R. 427-428). Ms. Rivers' last place of employment was at TCF Bank in Willowbrook, Illinois, where she worked from August 21, 2000 to approximately August 2003 (R. 125). Despite this apparent three year time span, Ms. Rivers actually only worked a little more than two years at the bank because she took two leaves of absence, one for maternity leave (eight weeks) and the other for health related reasons at the end of her employment (approximately five months) (R. 369-70).

While at TCF, Ms. Rivers did bank teller and phone customer service work (R. 125, 376-78). She had trouble with the counting functions associated with both jobs (R. 377-79). Ms. Rivers then worked briefly at TCF as a phone receptionist, but she experienced pain in her hands and wrist making it difficult to do the tasks required by her job (such as picking up the phone); thus, she was

7

given a leave of absence to recuperate (R. 371, 379-81). When this leave of absence was over, TCF determined that Ms. Rivers' health would not permit her to return to work, and they terminated her in August 2003 (R. 371, 376).

In January 2005, after she stopped working outside the home, Ms. Rivers became involved with the Jehovah's Witness Church (R. 415). At this time she gave up smoking marijuana once a week, as she had been doing for several years (R. 407). Since January 2005, she has engaged in volunteer work for the Jehovah's Witnesses, passing out literature and talking to people on the street and in their homes about the Jehovah's Witnesses' view of the Bible (R. 390-93, 415). To do this volunteer work, Ms. Rivers sits at bus stops, drives her car by people on the street, or visit homes. This work involves sitting and/or driving and walking for approximately 30-45 minutes for a "total of . . . an hour" each time she volunteers (R. 390-92). Sometimes she sits on her front porch and talks to passerbys (R. 391). Ms. Rivers also testified that, for the approximately two years preceding her administrative hearing, she studied the Bible regularly at home with her husband and son (R. 416) and attended classes at the church three days a week for one to two hours each day "fairly regularly," listening to tapes at home when she did not "feel good" (R. 414-15). On March 10, 2007, Ms. Rivers testified that she made a formal commitment and officially became a "Jehovah's Witness" (R. 422).

At home, Ms. Rivers says that she is often, and even "constantly," tired and in pain (R. 400-01). But, she does not like to take the narcotic pain pills she is prescribed, because they make her sleepy, and with a small child at home she "want(s) to be alert as much as [she] possible can to watch things" (R. 421). Although she says she feeds and cares for her young son, she also states that her son is "very understanding and . . .very helpful" and "independent" (R. 419). Thus, her son often

8

cooks for himself during the day, and his father usually cooks and takes care of him at night (R. 409, 419). Sometimes, Ms. Rivers watches television or colors or draws with her son during the day (R. 416). In the evenings and on weekends she also sometimes goes to the park with her husband and son and watches them play (R. 403, 416), or sometimes she will walk by herself (R. 403). She does not walk more than a block two or three times a week (R. 403), because she has pain and stiffness in different parts of her body, including her ankles, feet and knees, but especially in her knees (R. 393-399). Ms. Rivers has a walker, which she uses when she feels unable to walk using her own strength (R. 399).

Ms. Rivers testified that on a normal day she will rise, bathe, make her bed, get her son up for school and eat (R. 408). But, Mr. Rivers said that she loses focus and needs help to get out of bed in the morning (R. 437-38). Ms. Rivers also testified that she takes care of dusting and sometimes laundry, and cleaning the bathroom (R. 408), taking rest breaks as needed (R. 421). Mr. Rivers said that he does most of the housework, and any tasks Ms. Rivers performs she is able to complete only slowly (R. 437-38). Ms. Rivers also studies the Bible with her husband and son (R. 416). Her husband does the grocery shopping, but she sometimes goes with him to the store (R. 409). Ms. Rivers drives her mother to the grocery store approximately once each week to do grocery shopping (R. 376, 409-10). Ms. Rivers also spends time with her mother and mother-in-law during the day talking (R. 410). Sometimes, she will entertain Jehovah's Witnesses in her home (R. 417).

**B.**

Ms. Rivers claims that she cannot work because she is in constant pain in all parts of her body (R. 256, 296, 320), in particular her knees (R. 320, 393-94). She also experiences pain in her upper shoulders (R. 393, 397-98), and the back of her legs, as well as her ankles and feet (R. 393,

9

398-99), wrists and hands (R. 379, 393). Ms. Rivers states that this pain drains her energy and leaves her tired (R. 400-401, 419). She also describes occasional stiffness in her joints (R. 399-400); insomnia (R. 296); numbness and tingling in her legs (R. 256, 313).

Ms. Rivers claims that she cannot walk more than one block two or (at most) three times a week (R. 403); and, she cannot sit or stand or walk for longer than 30-45 minutes at one time (R. 391-93). She says that she goes through "depression episodes" about three times every month for a day (R. 404). Ms. Rivers is not being treated by prescription medicines for depression, but she has had a prescription for Vicodin (a narcotic) since December 9, 2005, that she said she takes for physical pain only about four times each month when the pain is unbearable (R. 396). The rest of the time she takes Advil or aspirin once or twice a day (R. 397). Sometimes, she uses rubbing alcohol or ointments to help surface pain in her shoulders (R. 398) and her knees (R. 396). When asked how her fibromyalgia impacts her involvement as a Jehovah's Witness, Ms. Rivers says she prays "a lot," and this enables her to "get up as freely as [she] would like to, move around, sit someplace else," and "take medication," even though she is "still . . . in pain" (R. 423).

## C.

We now turn to the medical evidence. At the administrative level, Ms. Rivers' DIB claim was based on fibromyalgia (R. 50) and tendinitis of the wrists (R. 51), not on CTS or lateral epicondylitis. The ALJ, however, found that Ms. Rivers has four "severe" impairments:

fibromyalgia,[4] mild obesity, chondromalacia[5] and mild degenerative changes of the knees (R. 17). We address the medical records in chronological order, rather than by the type of impairment, because most records contain evidence of multiple conditions. At the outset, we note that, although Ms. Rivers originally claimed an onset date of June 21, 2003, and has medical records in the file dating back to 2004, Ms. Rivers has amended her claimed onset of disability date to February 23, 2005 (R. 14, 363-64). This was a voluntary and knowing waiver of her right to claim benefits for any alleged disability prior to that date (R. 363-64). Therefore, we focus our review of the medical records from that date forward.

1.

We begin with the 2005 treatment notes from the University of Illinois-Chicago Medical Center ("UIC").[6] The earliest medical report in the file after the February 23, 2005, onset date is a treatment note by Dr. Felix A. Angelov dated March 17, 2005, titled "Pain Service Consult" (R. 238-39, 264-65 (final report)). In this treatment note, Dr. Angelov noted plaintiff's complaints of insomnia and body pain, especially in the elbows, shoulder, neck, knee and leg. The doctor also noted that Ms. Rivers reported over-the-counter pain medications such as Ultracet gave her no relief, and that her pain increased when the weather turned cold or rainy (R. 238). However, plaintiff's EMG and workup for rheumatoid diseases were negative, and other tests indicated normal motor

---

[4]"Fibromyalgia" is defined as a "syndrome of chronic pain of musculoskeletal origin but uncertain cause." Pain must be present "on both sides of the body, above and below the waist, as well as in an axial distribution . . .; additionally, there must be point tenderness in at least 11 of 18 specified sites." *See* Stedman's Medical Dictionary (27th Ed. 2000).

[5]"Chondromalacia" is also known as "polychondritis." There are several forms. In this case, the term refers to a "softening of the articular cartilage of the patella." *See* Stedman's Medical Dictionary (27th Ed. 2000).

[6]In her hearing testimony, plaintiff explained that she saw many doctors at UIC after her onset date for pain management (R. 365). For purposes of this opinion, any reference to a "treatment note" means that this note came from the various doctors at UIC who examined Ms. Rivers during the relevant time period.

11

strength and a normal neurological exam (R. 238). Dr. Angelov reported that Ms. Rivers had decreased range of motion in the neck and both shoulders, but there was no sign of inflammation of any joint (R. 238). Her gait was normal, as were the other physical examination findings, with the exception of multiple trigger points for pain (R. 238). Dr. Angelov diagnosed plaintiff with fibromyalgia, and recommended use of prescription medicines such as Motrin and Tylenol ES as well as lifestyle changes including ceasing to drink coffee and changing her sleeping habits (R. 239).

In a following treatment note dated May 3, 2005, titled "Pain Service Note" (R. 253), Dr. Naveen Reddy noted that plaintiff complained of trouble sleeping, despite starting Elavil (R. 253). Dr. Reddy also reported Ms. Rivers' subjective complaints of pain "all over her body," particularly in her wrists, and her statement that Ibuprofen and Ultracet did not relieve her pain.[7] Dr. Reddy reported that plaintiff had limited range of motion due to this pain (R. 253). But, Dr. Reddy concluded that Ms. Rivers' EMG with nerve conduction studies "revealed no pathology, normal conduction BUE." He also reported that her workup for rheumatoid diseases was negative (R. 253). Dr. Reddy prescribed Motrin and Elavil for pain (R. 253).

On June 1, 2005, Dr. Monica M. Aloman authored a treatment note titled "Arthritis Note" (R. 261 (final report)). Dr. Aloman reported Ms. Rivers' complaint of pain "all over her body" and of insomnia. Ms. Rivers also complained of stiff joints in the morning and a history of joint swelling. Ms. Rivers told Dr. Aloman that pain medications gave her no relief (R. 261). Dr. Aloman reported initial improvements in Ms. Rivers' sleep with Elavil, but noted that Ms. Rivers reported sleeping only about 4 hours per night. The doctor also noted that Ms. Rivers had gained 12 pounds

---

[7]We note that the plaintiff miscited this report as being authored by Dr. Alexandra Popescu, the doctor whom plaintiff claims is her treating physician (Pl.'s Mem. at 3). The plaintiff also miscited several other doctors as authors of progress notes they did not write (*Id.*).

that year (R. 261). Dr. Aloman prescribed Ultram, Flexeril, increased the dose of Amitriptyline to 50 mg. per day, and advised physical therapy. Dr. Aloman noted that test results were negative on the EMG and rheumatoid disease work up (R. 261).

On July 8, plaintiff called the UIC Arthritis Clinic reporting blurred vision. Ms. Rivers told the doctor that she believed this condition was caused by the Flexeril, even though she had not taken Flexeril for two weeks. Plaintiff reported taking 50 mg. of Elavil, and the doctor advised her to discontinue use of that medicine.

The fourth treatment note, by Dr. Alexandra Popescu, is dated September 7, 2005, and is titled "Arthritis Note" (R. 258-59 (final report)). Dr. Popescu noted Ms. Rivers' subjective complaints of pain, especially in her knees and at the bottom of her feet, as well as swelling in her elbow. Dr. Popescu also noted plaintiff's continued complaint of insomnia (she slept only three to four hours each night). Dr. Popescu reported that plaintiff had stopped all medication because of blurred vision. Dr. Popescu also indicated that "FMG" (fibromyalgia) was not diagnosed until 2005, but plaintiff had symptoms of it since 2003. Physical examination showed full range of motion in the neck, no swelling of any extremity or joint, and full range of motion without tenderness in the joints. Nonetheless, Dr. Popescu noted 11 "trigger points" of tenderness in Ms. Rivers' soft tissues: bilateral paracervical, upper trapezius, upper arms, postero-lateral proximal forearms, anserine bursae, and buttocks (R. 258). Dr. Popescu confirmed the diagnosis of fibromyalgia and added a new diagnosis of plantar fasciitis as the cause of plaintiff's bilateral foot pain. The doctor prescribed Ambien and Diclofenac (R. 259).

Thereafter, on November 30, 2005, Dr. Popescu wrote a follow-up treatment note titled "Arthritis Note" (R. 256-57). Dr. Popescu again wrote that Ms. Rivers reported "all over body pain"

13

and insomnia. Dr. Popescu stated that Ambien did not help plaintiff sleep, as plaintiff reported sleeping no more than two to three hours each night. Plaintiff also told Dr. Popescu that Dicofenac only helped a little with her pain; most of her pain was in her knees; and, she also had numbness and tingling in her legs. Dr. Popescu noted the same 11 trigger points of the soft tissues; and she ordered physical therapy and an x-ray of plaintiff's knees (R. 256).

On November 30, 2005, Melissa Koehl of UIC performed physical therapy for plaintiff. Ms. Koehl wrote a Physical Therapy Note indicating that plaintiff had been issued and instructed to use a cane to reduce pressure on her knees (R. 252).

On December 1, 2005, Dr. Brian Mulligan took x-rays of Ms. Rivers' knees to diagnose the cause of knee pain (R. 266). In Dr. Mulligan's report, he finds:

> Standing views of both knees in the AP and lateral projection show the left knee to have a smooth articular surface of the knee joint and patella. No fracture. There may be slight narrowing of the medial knee joint compartment. Lateral compartment unremarkable. No evidence of effusion.
>
> In the right knee, there is slight narrowing of the medial knee joint compartment and slight narrowing of the lateral compartment. Patellofemoral space and its articular surfaces are smooth. No fracture. No osteophytes. No effusion. There is a calcification of the quadriceps tendon insertion into the superior patella on the right side and also on the left side. This is an incidental finding.

(R. 266). Dr. Mulligan concluded that Ms. Rivers had "no acute bony injuries" (R. 266); but she did have mild to moderate degenerative changes in both knees due to "slight narrowing of the medial knee joint compartment" (R. 266).

On December 7, 2005, Ms. Rivers called the UIC Arthritis Clinic requesting a prescription for pain medication and complaining of blurred vision caused by Elavil. She also called to get confirmation about the knee x-rays and was told Dr. Popescu would return the call. Plaintiff called

14

again on December 7, 2005, complaining that she had not gotten the pain prescription nor heard from Dr. Popescu. Plaintiff filled a prescription for 180 tablets of hydrocodone (generic for Vicodin, a stronger analgesic) on December 9, 2005 (R. 24).

**2.**

The remaining medical reports from 2005 are not from UIC. We will now address those in chronological order.

On July 14, 2005, Ms. Rivers was given a psychological evaluation by Dr. Erika L. Liljedahl, Psy.D., acting for the Bureau of Disability Determination Services (R. 248-50). In this evaluation, Dr. Liljedahl did a clinical interview, a mental status examination and a review of an Activities of Daily Living Questionnaire, dated June 4, 2005. Dr. Liljedahl reported that plaintiff said she wanted to work but suffered from fibromyalgia and had pain all over her body, lack of energy, and fatigue; that her medications did not work; and that she has no friends or hobbies, does not do any chores, and does not cook (R. 248-49). Finally, Dr. Liljedhal concluded that plaintiff's mental status was "generally good" on all tests given to her (R. 249-50). Her prognosis was fair to good; but, Dr. Liljedhal found plaintiff to have some dependent and histrionic traits (R. 250).[8]

There is also a Psychiatric Review Technique form dated August 8, 2005, in which the agency consultant, Kirk Boyenga, determined that Ms. Rivers had no severe impairments (R. 281-82). Mr. Boyenga based his diagnosis on Listing 12.08 for personality disorders. In the rating of functional limitations under the "B" criteria of Listing 12.08, plaintiff had only mild limitations in

---

[8]Dr. Liljedhal noted that plaintiff questioned whether the SSA had wanted her to see a psychologist to see if she was "crazy" (R. 248-49).

15

daily living activities, maintenance of social functioning; and maintenance of concentration, persistence or pace (R. 281). The consultant found no evidence of any "C" criteria (R. 282).

In the Physical Residual Functional Capacity Assessment, dated August 11, 2005 (R. 285-92), the agency examiner found that Ms. Rivers could occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk (with normal breaks) for a total of about six hours in an eight hour workday; sit (with normal breaks) for a total of about six hours in an eight hour workday; push and/or pull (including the operation of hand and/or foot controls) in an unlimited manner, subject to the prior limitations. She had no other noted limitations (R. 287-90). In the additional comments section (R. 292), the examiner wrote that a CT scan show carpal tunnel syndrome and lateral epicondylitis in both arms, and the MER diagnosis of fibromyalgia with noted multiple trigger points, decreased rotation in the neck and shoulders secondary to pain, as well as other joints. The EMG and rheumatoid exams were negative. The plaintiff was given a treatment plan (including medication to control her pain and weight) (R. 292). Plaintiff's perceptions of limitations and pain were "considered partly credible" and "not totally supported with objective findings" (R. 292).

### 3.

The following medical reports are dated in 2006 and 2007. On January 18, 2006, there is a treatment note from Dr. Robert M. Reed, titled Arthritis Note. In this note, Dr. Reed reports that plaintiff has fibromyalgia, and Elavil did not work as well as Ambien for insomnia. The plaintiff reported continued pain, especially in her knees, with a swollen left knee. MRIs were taken of Ms. Rivers' knees on January 26, 2006, which showed minor abnormalities of the right knee and early degenerative changes of both knees (R. 316). More medications were prescribed.

16

On March 8, 2006, in a treatment note titled "Arthritis Note," Dr. Tasin Shuaipaj reviewed the report of plaintiff's MRI on the left knee done on January 26, 2006. The resulting impression was:

1. Small knee joint effusion.
2. Early mucinous degeneration of both menisci without tear.
3. Grade 2 patellofemoral chondromalacia and focal grade 3 chondromalacia in the central femoral groove.

(R. 319). The MRI, stated Dr. Shuaipaj, "showed patellar femoral chondromalacia" (*Id.*).

Dr. Shuaipaj also noted that plaintiff's history of pain for fibromyalgia had not been treatable with pain medications. At this exam, plaintiff reported ankle swelling, right arm numbness and tingling, headaches, body aches along the shoulder, arms and neck, an overactive bladder, constipation and knee pain. Dr. Shuaipaj noted that plaintiff was obese, had decreased range of movement in the left shoulder, and tenderness in the shoulder joint and lower neck and knee (R. 319).

Dr. Popescu completed a Fibromyalgia Residual Functional Questionnaire ("FRFQ"), dated March 17, 2006 (R. 309-10). In the FRFQ, Dr. Popescu identified Ms. Rivers' signs and symptoms of fibromyalgia as: multiple tender points; nonrestorative sleep; severe fatigue; morning stiffness; subjective swelling; lack of endurance; and impaired concentration. Dr. Popescu reported that Ms. Rivers had pain in the lumbosacral spine; the cervical spine; the thoracic spine and the chest, as well as the legs and knees/ankles/feet. Dr. Popescu described plaintiff's pain as "constant" and precipitated by movement, overuse, stress and fatigue (R. 309).

Dr. Popescu also reported that plaintiff's descriptions of fatigue and pain were "credible" based on subjective and objective findings and medical expertise; that emotional factors contributed

17

to the plaintiff's limitations; that her concentration and attention was frequently impacted by her fatigue and pain; and, that plaintiff had marked limitations in the ability to deal with work stress (R. 310). Dr. Popescu concluded that as a result of plaintiff's medical impairments, plaintiff did not retain the residual functional capacity to work. And, if plaintiff were to resume work, she would need to lie down at "unpredictable intervals during a work shift" and would be absent from work at least three times or more each month (R. 310).

The remaining notes from 2006 and 2007 are almost exclusively from Dr. Harpinder S. Ajmani.[9] In a typewritten statement dated September 25, 2006, Dr. Ajmani diagnosed Ms. Rivers with fibromyalgia and polyarthritis, noting examination dates of August 7, 2006, August 12, 2006 and September 18, 2006. The rest of Dr. Ajmani's notes are handwritten. Two notes, dated September 25, 2006 and October 27, 2006, state that plaintiff not only suffered from fibromyalgia, but also from "Chondromalacia Patellae (Rt)" and depression. Dr. Ajmani also indicated that Ms. Rivers' complaints of pain were "out of proportion to clinical findings" (R. 299). He referred plaintiff to Dr. Jaber for management of depression and wanted to continue physical therapy for her knees. On December 11, 2006, Dr. Ajmani also prescribed a walker for plaintiff (R. 294), which she ordered (R. 295).

On March 26, 2007, Dr. Ajmani again diagnosed fibromyalgia and chondromalacia patallae, with bodyache, fatigue, and pain in her hands. There appeared to be swelling in her joints with tenderness. The treatment plan was for more physical therapy, a prescription for Elavil and another medication (which we cannot identify because the writing is illegible) (R. 335).

---

[9]There are a set of handwritten treatment notes, dated November 3, 2006 and November 20, 2006, by another doctor who does not appear to be Dr. Ajmani. The handwriting is completely illegible (R. 336-37).

**D.**

At the administrative hearing, held on May 29, 2007, the ALJ reviewed the medical evidence summarized above and heard testimony from Ms. Rivers, her husband, and a Vocational Expert ("VE"). We have summarized above the testimony of Ms. Rivers and her husband that is material to our review. We now address below only the VE's testimony.

The ALJ began her questioning of the VE by asking him to describe plaintiff's past work history from a vocational standpoint (R. 425). The VE testified that plaintiff had performed jobs within a variety of physical exertion levels (from medium/heavy to light to sedentary) and had managed to hold both semi-skilled, as well as skilled jobs (R. 425-28). The ALJ then asked the VE several hypothetical questions (R. 428-30).

The ALJ asked the VE to assume a person plaintiff's age (33 at the time of the hearing), who had finished 8th grade and started 9th grade and was literate; had past relevant work consistent with plaintiff's history; and had the residual functional capacity to perform a full range of work at the light exertional level, with limitations on the ability to climb ladders, ropes or scaffolds or work on moving or unstable surfaces and the inability to work in extreme temperature, humidity, or at unprotected heights or with unguarded hazardous equipment (R. 428-29). The VE testified that this hypothetical claimant could perform jobs at the light exertional level, which typically includes the teller and cashier positions (R. 429).

The ALJ then modified the hypothetical by adding more limitations: the inability to perform constant repetitive pushing or pulling against resistance with the lower extremities, or constant repetitive lifting or reaching overhead; and the ability only to occasionally climb ramps or stairs, stoop, kneel, crouch or crawl (R. 429). The VE testified that these additional limitations would not

19

limit the hypothetical claimant's ability to perform light work, such as the teller and cashier positions (R. 429-30).

The ALJ then asked the VE to assume all the previous limitations of the first two hypotheticals, with the additional restriction that the hypothetical claimant could only perform the full range of sedentary (not light) work at an exertional level (R. 430). The VE testified that such a person could perform plaintiff's past job as a cashier at the semi-skilled level. The VE also stated that there were other jobs plaintiff had not performed at the unskilled level that this hypothetical claimant could also perform, such as: telemarketing positions (approximately 3,000 jobs); cashier positions (at least 3,000 jobs); and food and beverage order clerk (approximately 2,500 jobs) (R. 430).

The ALJ then asked the VE whether a person performing these jobs would be expected to be on task and productive 100 percent of the time (excluding breaks) (R. 430). The VE said no, and that being on task 5-10 minutes an hour on average would be acceptable (R. 430-31). But the VE said that if a person were frequently distracted by pain or fatigue and could not stay on task or be productive, then that person could not hold these jobs (R. 431). In response to questioning by Ms. Rivers' attorney, the VE said that the tolerance for unexcused absences would generally be no more than one day a month, but that could vary depending upon the employer (R. 431-32). The VE said a person who regularly took off more than one day a month could not hold these jobs (R. 432).

## IV.

In her written opinion, the ALJ found at Step 1 that plaintiff was not currently working but, based on her previous work history met the insured status requirements of sections 216(I) and 223

20

of the Social Security Act through December 31, 2008. Thus, the relevant period of time for establishing disability was between February 23, 2005 and December 31, 2008.

At Step 2, the ALJ determined that plaintiff had severe impairments. In particular, the ALJ found medical evidence to support severe impairments in the following four areas: fibromyalgia, mild obesity, chondromalacia and mild degenerative changes of the knees. The ALJ found these impairments severe because they imposed at least minimal functional limitations upon the plaintiff. The ALJ noted that plaintiff had been treated for CTS, but her most recent EMG, taken in October 2004, had been normal and her treating neurologist at that time opined that plaintiff did not need further treatment. The ALJ found that there was not enough medical data after the amended alleged onset date to establish depression as a severe impairment (R. 17).

At Step 3, the ALJ determined that, although plaintiff had severe impairments at Step 2, the medical evidence did not establish that plaintiff's impairments met or equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). The ALJ noted that there was no listing for fibromyalgia or obesity and thus focused on whether Listing 1.02 applied to the evidence regarding plaintiff's degenerative changes in the knees and chondromalacia. The ALJ found that it did not, because there was no evidence of a "12-month or longer period of ineffective ambulation during the relevant time," nor was there such evidence regarding "ineffective use of claimant's upper extremities after the amended alleged onset date" (R. 17).

### A.

Before moving to Step 4, the ALJ determined plaintiff's RFC. The ALJ found that plaintiff could perform and sustain "a wide range of unskilled sedentary work" with limitations on climbing,

constant repetitive reaching or lifting, exposure to extreme temperatures or heights or unguarded, hazardous equipment. The ALJ, however, did not limit plaintiff's RFC based on pain, fatigue or lack of concentration, finding that plaintiff would "only rarely" suffer from such conditions during the workday if she were performing simple, unskilled work (R. 17-18).

In making this determination, the ALJ engaged in a two-step process (R. 28). *First,* she determined that plaintiff had medically verifiable physical impairments that could be expected to produce pain or other symptoms. The ALJ found four such impairments at Step Two: fibromyalgia, mild obesity, chondromalacia and mild degeneration of the knees (R. 17). *Second,* the ALJ made credibility findings regarding plaintiff's statements about her symptoms, particularly her pain and fatigue, for purposes of assessing whether the "intensity, persistence and limiting effects" of the symptoms plaintiff described should be used as limitations on plaintiff's ability to work (R. 33). The ALJ acknowledged that there are rarely, if ever, objective medical findings associated with the impairment of fibromyalgia (R. 33). That said, the ALJ concluded that: "the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms," but, the testimony and evidence regarding "the intensity, persistence and limiting effects of these symptoms" was not "fully consistent with nor well-supported by the record as a whole" (R. 33). The ALJ thoroughly explained the basis for her decision.

- *First,* the ALJ found that she could not give "controlling weight" to the opinions from any treating physician because they are "not the type of detailed function-by-function RFC opinions entitled to such weight" (R. 27).

- *Second,,* the ALJ specifically rejected Dr. Popescu's opinion that plaintiff's complaints of pain and fatigue were credible and she could not sustain any work (R. 28). The ALJ's reason for rejecting this opinion was that Dr. Popescu "had a relatively brief treatment relationship with claimant and she failed to offer a detailed RFC opinion" (R. 28). The ALJ reasoned that the treatment relationship was

"relatively brief," because there were only two examinations by Dr. Popescu. The ALJ also stated that Dr. Popescu's RFC opinion was not "fully credible," because she did not conduct any "apparent intervening clinical exams" before she rendered her March 17, 2006 RFC opinion.

- *Third,* the ALJ also rejected the State Agency doctor's RFC report (R. 285-92), finding it inconsistent with the claimant's treatment records and not credible, because the State Agency doctor had not treated, examined or even observed plaintiff in reaching this conclusion (R. 28).

The ALJ also made extensive findings regarding the non-medical evidence in the record, as she was required to do, pursuant to 20 C.F.R. 404.1529(c) and 416.929(c). The ALJ found that the non-medical evidence in the record did not substantiate Ms. Rivers' statements regarding the intensity, persistence and limiting effects of plaintiff's symptoms on her ability to work.

The ALJ gave examples from the evidence to support her conclusion:

- The ALJ pointed to the objective medical evidence regarding the degenerative changes in plaintiff's knees. The ALJ found that the objective medical evidence did not "well support claimant's complaints of extreme pain in her knees," because the "imaging studies" indicated "only mild to moderate changes, and the clinical examinations typically" were "normal or near normal." (R. 33). The ALJ also pointed to Dr. Ajmani's conclusion in 2006 that "claimant's complaints of knee pain exceeded what would be expected from the abnormalities reflected in [the x-rays and MRIs of her knees] and his clinical exams." (R. 33).

- The ALJ pointed to statements made by plaintiff to her treating physicians regarding "her experience with pain medication." After careful review of the pharmacy records, as well as the medical records where prescription dates were noted, the ALJ was able to conclude that "some of [plaintiff's] statements to treating physicians" that she regularly took her pain medicines were "contradicted, at least in part, by the contemporaneous pharmacy records" showing that her medication should have run out if she was taking it according to the original prescription (R. 33). The ALJ also observed that, although plaintiff reported to her doctor that she could not afford Ambien (for sleep), the prescription cost was only $5 per month (because she had insurance). The plaintiff then switched from Ambien to Lunesta, even though the price of this prescription was $15 per month (R. 33).

23

Next, the ALJ found that plaintiff's testimony about her experience with Vicodin, a pain relief medication, was not credible. Plaintiff told the ALJ that she did not take Vicodin, in part, because it made her too sleepy. But, the ALJ observed that if Vicodin made her sleepy, then the plaintiff had no explanation for why she did not take it at night to help her with insomnia, as well as pain (R. 33). The ALJ noted that plaintiff's explanation about why she only took Vicodin when the pain was extreme (because she needed to be alert rather than sleepy with a young child at home) was not necessarily consistent with her statements regarding the severity of her pain (R. 33). The ALJ reasoned that if the plaintiff's pain were as severe as she alleged, then "those episodes of severe pain" were "apparently . . . very rare," because plaintiff's pharmacy records showed that plaintiff only filled prescriptions for 180 tablets from December 9, 2005-November 22, 2006, and then 35 additional tablets between July 2006 through March 2007 (R. 33).

Finally, with respect to non-medical evidence related to credibility, the ALJ found that Ms. Rivers' daily activities showed that she was "far less limited by pain or fatigue than she described at the hearing" (R. 34). For example, Ms. Rivers' ability to operate as the primary care-giver for her son, while her husband was at work from 8 a.m. until at least 4 p.m. during the work week, indicated that she had the wherewithal to do more physically than she claimed (R. 34). In addition to her childcare activities, Ms. Rivers' also testified that she completed a longer than two-year process to become a Jehovah's Witness, participating extensively in activities with that group as well as in her neighborhood throughout the period after her alleged onset date. The ALJ found that these activities, although voluntary and performed for relatively brief periods, were nonetheless suggestive of plaintiff's true ability to focus, concentrate and maintain attention when she wanted to do so (R. 34).

24

**B.**

At Step 4, the ALJ found that plaintiff could not perform her past relevant work (R. 34). At Step 5, the ALJ used the Medical-Vocational Rules (the "Grid"), 20 C.F.R. Pt. 220, App.2, to find that plaintiff was not disabled and thus not entitled to DIB.

Based on her age, plaintiff was defined as a "younger individual age 18-44, on the amended alleged disability onset date" (R. 35). The ALJ noted that plaintiff made inconsistent statements about the length of her education, stating that she had completed 10th grade, 11th grade, 8th grade and then part of 9th grade (R. 35). Because the plaintiff had not completed a GED, the ALJ found she had a limited education, albeit one that "was sufficient for her to secure and perform a wide range of semiskilled work" (R. 35).

Nonetheless, the ALJ determined that plaintiff's RFC did not include the ability to sustain semi-skilled work, but rather permitted only a full range of sedentary work at an unskilled level (R. 17-18; 35-36). Based on that RFC, the ALJ found that there were a significant number of jobs plaintiff could perform: namely, telemarketer (3,000 jobs); cashier (3,000 jobs); and food and beverage order clerk (2,500 jobs). The ALJ found that plaintiff's ability to concentrate fell within the tolerance level that the VE said was required for those jobs; and thus rejected the contention that a limitation on concentration precluded plaintiff from performing them. Using this RFC, the ALJ applied Medical-Vocational Rule 201.25 and found that plaintiff was "not disabled."

**V.**

Ms. Rivers makes two arguments in support of her motion for summary reversal and/or remand. Her lead argument is that the ALJ's RFC determination (and, thus, her Step 5 decision finding plaintiff not disabled) is wrong, because the ALJ rejected certain opinions of a treating

physician that arguably supported a more limited RFC than the one the ALJ settled on. Plaintiff argues that these rejections violated Social Security Ruling (SSR) 96-2p and constitute reversible error (Pl.'s. Mem. at 6). Ms. Rivers' also contends that the same analysis by the ALJ violated SSR 96-5p (Pl.'s Mem. at 9). We find both arguments without merit.

## A.

The plaintiff's first argument, that the ALJ committed reversible error by violating SSR 96-2p, is based on the notion that the ALJ: (1) applied inappropriate criteria for rejecting the medical opinions; (2) did not give the medical opinions controlling weight; and (3) did not consider alternative weight assignments when controlling weight was not given (Pl.'s Mem. at 6-7). In particular, plaintiff argues that the ALJ erroneously rejected the treating doctors' opinions because they were "not the type of detailed function-by-function RFC opinions entitled to [controlling] weight," which plaintiff says is not the correct standard set forth in SSR 96-2p (Pl.'s. Mem. at 7, citing R. 27). Plaintiff argues that SSR 96-2p only requires that the medical opinion "be well-supported and not inconsistent with the medical evidence in order to be given controlling weight" (*Id.*). Plaintiff also argues that, even if a detailed function-by-function RFC opinion was required, Dr. Popescu's March 17, 2006 opinion satisfies that standard (*Id.*).

SSR 96-2p states, in relevant part:

> Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques.

> Even if a treating source's medical opinion is well-supported, controlling weight may not be given to the opinion, unless it also is "not inconsistent" with the other substantial evidence in the case record.

SSR 96-2P (3), (4). Thus, while we agree that this rule does not require a treating physician's medical opinion to contain a detailed function-by-function RFC in order to be given controlling weight, the rule does require a treating physician's opinion to be both well-supported and "not inconsistent with *other substantial evidence in the record.*" SSR 96-2p (emphasis added). Thus, plaintiff's argument that SSR 96-2p only requires a treating physician's opinion to be consistent with "the medical evidence" (Pl.'s Mem. at 7) is incorrect.

The Explanation of Terms section of SSR 96-2p reinforces this point. That section defines "not inconsistent" as: "a term used to indicate that a well-supported treating source medical opinion need not be supported directly by all of the other evidence . . . as long as there is no other substantial evidence in the case record that contradicts or conflicts with the opinion." This same section defines "substantial evidence" as: "such relevant as a reasonable mind would accept as adequate to support a conclusion that is contrary to the conclusion expressed in the medical opinion. Depending upon the facts of a given case, any kind of medical or non-medical evidence can potentially satisfy the substantial evidence test." These definitions (together with illustrative examples in SSR 96-2p) make clear that the ALJ must consider not only medical, but also non-medical evidence in determining whether a treating physician's opinion is "inconsistent with the other substantial evidence in the case record."

In this case, the ALJ did not stop with the statement that the treating physician failed to provide a detailed function-by-function RFC. Rather, the ALJ thoroughly considered both medical and non-medical evidence. The ALJ explained that Dr. Popescu's medical opinion was not well-supported by medically acceptable clinical and laboratory diagnostic techniques, because Dr. Popescu had not examined Ms. Rivers in the months after the October and November 2005 progress

27

notes at the UIC Arthritis Clinic and before Dr. Popescu's March 17, 2006 RFC opinion. The ALJ also stated that she considered Dr. Popescu's treating relationship with plaintiff – which consisted of two visits – to be "relatively brief."

The ALJ also explained that Dr. Popescu's medical opinion was inconsistent with other medical and non-medical evidence in the record. The ALJ found credible Dr. Ajmani's progress note, dated October 27, 2006, which found plaintiff's complaints of pain exceeded what would be expected from the clinical tests ordered by Dr. Popescu in November 2005 (x-rays) and Dr. Reed in January 2006 (MRI), and from other clinical exams. The ALJ also found that Dr. Popescu's RFC was inconsistent with other, non-medical evidence, such as: (1) plaintiff's daily activities (including her primary daytime care of her young son and her participation with the Jehovah's Witnesses); (2) her reluctance to fill her prescription for and take the pain medications she received; and (3) various contradictory statements she made regarding her use of medication, her education, and the fact that although Vicodin made her "sleepy" she would not take it to help her with her insomnia and pain (R. 29-32). The Court finds the ALJ's decision not to give controlling weight to Dr. Popescu's RFC assessment and opinion is supported by substantial evidence in the record.

The plaintiff's alternative argument – that the failure to give any weight to Dr. Popescu's opinion violated SSR 96-2p – also fails. As plaintiff points out, SSR 96-2p does allow the ALJ to give deference or some weight to a medical opinion, even if it is not entitled to controlling weight. "Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927." SSR 96-2p (Policy Interpretation).

That said, nothing in SSR 96-2p indicates that this deference should be blind. Rather, the import of SSR 96-2p is that the ALJ is entitled to decide whether the treating physician's opinion

is medically well-supported and stands up against the other substantial evidence in the record (including non-medical evidence). If it does not, then SSR 96-2p does not require the ALJ to defer to that opinion and give it any weight.

Here, the ALJ sufficiently explained why she declined to give weight to Dr. Popescu's RFC opinion. To briefly review: Dr. Ajmani reviewed the test results ordered (but not reviewed) by Dr. Popescu, and he concluded that Ms. Rivers' complaints of pain exceeded what would be expected given the results of those tests (R. 299). The Court finds that this medical evidence alone provided substantial evidence for the ALJ's choice not to defer to Dr. Popescu's RFC opinion regarding the nature and severity of her pain and fatigue, because SSR 96-2p defines "substantial evidence" as more than a "scintilla" but less than a "preponderance."

Moreover, the ALJ also points out that Dr. Popescu only treated plaintiff twice, and thus this treating relationship was "relatively brief" (R. 28). By comparison, Dr. Ajmani saw plaintiff eight times (R. 293-322, 323-333, 334-48, 349-56).[10] The kind of brief relationship Dr. Popescu had with plaintiff provides reason for the ALJ to decline giving deference to Dr. Popescu's medical opinion as that rendered by a treater. *See Schenk v. Barnard*, 357 F.3d 697, 702 (7th Cir. 2004) ("It would be exceedingly illogical to credit a doctor's opinion because he is more likely to have a detailed and longitudinal view of the claimant's impairments when, in fact, there is no detail or longitudinal view").

Thus, because there was substantial evidence in the record to support a rejection of Dr. Popescu's March 17, 2006 opinion, the Court finds that the rejection of this opinion and its

---

[10]Based on the number of sessions each doctor had with Ms. Rivers, we do not understand why the ALJ considered Dr. Popescu but not Dr. Ajmani to be a treating physician. Regardless, we find that the ALJ was entitled to consider and credit Dr. Ajmani's notes as a basis for rejecting the RFC opinion of Dr. Popescu.

additional limitations on the ALJ's RFC assessment was consistent with and not in violation of SSR 96-2p.

We note that the ALJ addressed, but placed no weight on, opinions offered by two other doctors who treated Ms. Rivers: Dr. Gryniewicz-Sika and Dr. Iftikhar (R. 28). At the threshold, we note that both of those doctors offered opinions based on their encounters with Ms. Rivers prior to February 23, 2005, the claimed onset date that Ms. Rivers adopted at the administrative hearing. While the parties have extensively discussed the merits of those opinions and the ALJ's rejection of them, we failed to see their relevance in this case. Both of these doctors expressed opinions about Ms. Rivers' conditions and limitations during a time period in which Ms. Rivers no longer claims that she was unable to work. Moreover, the record reflects that plaintiff's selection of an amended onset date of February 23, 2005 was purposeful: her attorney said that he selected that date because "the records are stronger from that point. That's when her condition seemed to worsen" (R. 363). In these circumstances, we find no error in the ALJ declining to place weight on the opinions of Drs. Iftikhar and Gryniewicz-Sika.[11]

### B.

We now turn to plaintiff's claim that the ALJ's RFC determination violated SSR 96-5p. Ms. Rivers argues that Dr. Gryniewicz-Sika's medical opinion that Ms. Rivers was "disabled" should not have been discounted simply because it addressed an issue reserved to the Commissioner under SSR 96-5p. Rather than "simply ignoring it," plaintiff argues that the ALJ should have made a reasonable

---

[11]In so ruling, we do not categorically state that medical evidence for a period that predates the onset date never can be relevant. For example, if there is a question about whether a claimant has a particular medical condition, pre-onset date evidence may shed some light on that question. But, in this case, the issue is not whether plaintiff has severe impairments. At Step 2, the ALJ found that she does. Rather, the question is whether during the claimed period of disability commencing on February 23, 2005, those impairments create limitations that render her disabled. An opinion that plaintiff could not work prior to February 23, 2005, a position that she does not assert, does not shed light on what her limitations are during the alleged period of disability.

effort to re-contact this doctor for clarification of her opinion and an explanation for the basis of this statement according to the factors discussed in 20 C.F.R. 404.1527(d) and 416.927(d). (Pl.'s Mem. at 9). Although plaintiff is correct that SSR 96-5p allows an ALJ to recontact a medical source for clarification, and cautions an ALJ not to simply ignore a treating physician's opinions because they reach conclusions reserved to the Commissioner, we find this argument a moot point.

Plaintiff's arguments regarding this SSR 96-5p focus entirely on the medical opinion of Dr. Gryniewicz-Sika, whose opinions we have found outside the relevant time period for purposes of reviewing the claims made in this case (*i.e.*, those after the amended onset date of February 23, 2005). Even were that not the case, we would find no violation of SSR 96-5p.

As plaintiff concedes, the RFC determination was reserved to the Commissioner (and the ALJ in the first instance) by SSR 96-5p. Under that rule, the opinions of treating or examining physicians on the issue of whether plaintiff was disabled, although not to be ignored, were not entitled to "controlling weight or special significance." *See* SSR 96-5p, 1996 WL 374183 (SSA), at ** 2, 5. The ALJ was required to consider those views with all other evidence in the record, but the ultimate decision on this issue was reserved exclusively to the Commissioner (*Id.* at *2), because the disability finding goes beyond medical judgment and requires evidence and knowledge that is not the expertise of physicians (*Id.* at *5). In this case, we find no error by the ALJ in applying SSR 96-5p. An opinion by Dr. Gryniewicz-Sika that Ms. Rivers was "unable to work" prior to the claimed onset of February 23, 2005, does not speak to Ms. Rivers' ability to work, *vel non*, after that time.

31

## CONCLUSION

For the reasons set forth above, the Court directs the Clerk of the Court to enter judgment in favor of the Commissioner granting her motion for summary affirmance (doc. #18). The Court denies the plaintiff's motion for summary reversal and/or remand (doc. # 17). This case is terminated.

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**Dated: April 29, 2009**